Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Elwood LEGUILLOU, Plaintiff,
v.
LYNCH FORD, INC. Defendant.

No. 99 C 3449.

Feb. 14, 2000.

MEMORANDUM ORDER AND OPINION

ANDERSEN, District J.

*1 After failing to find financing for a vehicle purchased by Elwood Leguillou, Lynch Ford repossessed the vehicle. In response, Leguillou filed the instant six Count Complaint. In his Complaint, Leguillou alleges: a violation of the Truth in Lending Act (Count I), a violation of the Equal Credit Opportunity Act (Count II), a violation of the Fair Debt Collection Practices Act (Count III), a violation of the Illinois Commercial Code (Count IV), a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V), and a violation of the Uniform Deceptive Trade Practices Act (Count VI). Pursuant to Federal Rule of Civil Procedure 12(b)(6) defendant Lynch Ford has brought a Motion to Dismiss Counts I, II, and III of the Complaint. For the reasons set forth below, the motion is granted. Since we decline to exercise jurisdiction over the state law claims in Counts IV, V, and VI, this case is hereby dismissed.

BACKGROUND

For the purposes of this motion the following facts, which come from Leguillou's Complaint, are taken as true. In the beginning of March of 1999, Leguillou saw an advertisement placed by Lynch Auto Group in the Sun Times offering instant credit. The advertisement indicated that "we can help almost any credit situation." On March 12, 1999, Leguillou went to the Lynch Auto Group and inquired about purchasing a Chrysler. After a credit check, the Lynch representative told Leguillou that he did not qualify to purchase a Chrysler due to his poor credit history. The Chrysler representative suggested that Leguillou return later to speak with a Ford salesman.

On March 19, 1999, Leguillou returned to Lynch Auto to speak to Mr. Mayuga, a Ford representative. Mayuga told Leguillou of a Lynch special offer of "0.9% financing or $1,000." Leguillou responded that, because of his poor credit rating, he did not believe he would qualify for 0.9% financing. Mayuga then offered financing at 11.9%. Leguillou then looked for a car and found a 1999 Ford Ranger priced at $15, 565.00. Mayuga told Leguillou that "If we shake, we got a deal." They shook hands, and then Leguillou went to speak with the finance manager at Lynch.

That same day Leguillou signed a retail installment contract which indicated that "by signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract." The retail installment contract stated an annual percentage rate of 11.90%, an amount financed of $15, 943.57, and a finance charge of $5,392.43.

Leguillou also signed the vehicle purchase order. The back of the vehicle purchase order contained the following paragraph.

> Failure to Obtain Proposed Financing. Seller and Purchaser intend that the retail installment contract for ordered motor vehicle executed between Seller and Purchaser will be assigned to a sales finance agency of the Seller's choice. If financing cannot be obtained within 5 business days for purchaser according to the proposals in the retail installment contract executed between Seller and Purchaser, either Seller or Purchaser may cancel the agreement shown on the face of this Order and the retail installment contract. In the event of such a cancellation if the vehicle hereunder has been delivered to Purchaser, Purchaser shall, within 2 days of such notice, return the motor vehicle to Seller's place of business and Seller shall return to the purchaser all of the purchaser's deposit less Seller's cost of repairing damages occurring to the vehicle while in the Purchaser's possession and this contract shall then be null and void.

*2 After finishing the paperwork, the finance manager told Leguillou that the deal was completed and the car belonged to him. Leguillou suggested that he leave the truck at Lynch until April 1, 1999, because he would not have a parking space. After much encouragement from Mayuga, Leguillou took the truck with him.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT I

On March 27, 1999, Leguillou received a letter from Fairlane Credit, LLC dated March 24, 1997. This letter informed Leguillou that financing was not available at 11.9%, but approval could be granted on other terms. Leguillou was instructed to pick up information about a different interest rate at the place where he purchased the vehicle. The letter disclosed that the credit agency could not discriminate against applicants on the basis of race, color, religion, nation origin, sex, marital status, or age. Further, the letter informed Leguillou that he had a right to a written statement of the reasons for Fairlane's decision to deny him credit and informed Leguillou of the credit reporting agencies which it used to get Leguillou's credit history.

Lynch demanded the return of the vehicle. Leguillou refused to return the vehicle, and Lynch Ford repossessed the vehicle from his place of business on April 18, 1999.

Leguillou thereafter filed a six Count Complaint. In Count I he alleges a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1638(a)(4), and Regulation Z, 12 C.F.R. §§ 226.5 and 226.8(b). In Count II he alleges a violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d), and Regulation B, 12 C.F.R. § 202.9. In Count III Leguillou alleges a violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692(6)(A). In Count IV he alleges a violation of Section 9-503 of the Illinois Commercial Code, 810 ILCS 5/9-503. In Count V Leguillou alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10, and a violation of the Illinois Constitution. In Count VI he alleges a violation of the Uniform Deceptive Trade Practices Act, 815 ILCS 505/2.

DISCUSSION

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests whether the plaintiff has stated a claim, not whether the plaintiff will prevail on the merits. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In deciding a motion to dismiss, the court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997). The court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

I. *Count I: The Alleged Violation of the Truth in Lending Act*

Leguillou alleges that Lynch violated TILA because the original disclosed credit terms were not implemented. Since they were never implemented, Leguillou argues that the terms could not have been accurate.

*3 Congress enacted TILA "to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a); *Brown v. Marquette Sav. & Loan Ass'n,* 686 F.2d 608, 612 (7th Cir.1982). Creditors must clearly and accurately reveal to consumers the cost of credit, including all finance charges. 15 U.S.C. § 1605, 1638, 1632; 12 C.F.R. § 226.18 (1995). The stringent disclosure requirements are designed to prevent creditors from circumventing TILA's objectives by burying the cost of credit in the price of the goods sold. *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 364, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973). The disclosures made prior to the consummation of a credit transaction must accurately reflect the cost of the transaction. 15 U.S.C. §§ 1601, 1638; 12 C.F.R. § 226.17(b); *Jasper v. New Rogers Pontiac, Inc.,* No. 99 C 5195, 1999 WL 1024522 (N.D.Ill. Nov. 5, 1999).

Defendant contends that all of the disclosures were accurate when Leguillou signed the contract. This contention means that we must determine when the parties formed a binding credit transaction. *Quake Const. Inc., v. American Airlines, Inc.,* 141 Ill.2d 281, 288, 565 N.E.2d 990 (1990). Under the facts here, the plaintiff was contractually bound by the price and credit terms stated in the retail installment contract upon signing the retail installment contract. When Leguillou left the dealership with the automobile, he had a right to possession of the automobile. Leguillou would have become the owner when he paid for the car.

The provision of the retail installment contract at issue here allowed either party to void the agreement in the event that financing could not be obtained. That provision is a condition subsequent to the contract. The contract was not conditional on acquiring

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

financing, however, either party had the option of canceling the contract if financing could not be obtained.

Disclosures must be accurate at the time a deal is consummated. *Graves v. Tru-Link Fence Co.,* 905 F.Supp 515, 520 (N.D.Ill.1995). Thus, the required disclosures here must have been accurate when Leguillou signed the retail installment contact. The disclosures were accurate when Leguillou signed the contract. Leguillou does not allege that the disclosures would have been inaccurate if he had been offered credit at 11.9%. Thus, there is no TILA violation.

Plaintiff relies on Judge Holderman's decision in *Williams v. Thomas Pontiac* to show that a factually similar claim has survived a motion to dismiss. *Williams,* No. 99 C 882, 1999 WL 787488 (N.D.Ill.1999). Williams signed an agreement and took possession of an automobile. The dealership was unable to obtain financing, but it had inaccurately informed Williams that her financing had been approved. Further, the provision in Williams' contract indicated that the dealership must notify her of a failure to obtain financing within three days, but the dealership took longer to inform her of the failure to obtain credit. The time lag between when the dealership contractually indicated that it would inform Williams of its failure to obtain financing and when the dealership actually informed Williams was critical to Judge Holderman's determination that sufficient facts were alleged to defeat a motion to dismiss.

*4 The facts alleged in the instant Complaint show that Leguillou was treated differently than Williams. In this case, Fairlane made its decision not to extend Leguillou credit within the contractually mandated period of five business days. Further, Leguillou was well aware of his potential credit difficulties. Based on the facts alleged in the Complaint, no TILA violation occurred.

Plaintiff entered into a fully binding contract with Lynch Ford. A condition subsequent was used to cancel the contract. This set of facts does not undermine the validity of the original TILA disclosures. Accurate disclosures do not become violations because they are rendered inaccurate by subsequent events. "If information disclosed in accordance with [TILA] is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part." 15 U.S.C. § 1634. Since the disclosure was accurate when the contract was completed, the lack of available financing at 11.9% does not render the disclosures actionable. Thus, Leguillou fails to state a claim under TILA and this Count is dismissed.

II. *Count II: The Alleged Violation of the Equal Credit Opportunity Act*

Leguillou alleges that Lynch violated ECOA because Lynch never issued a disclosure explaining Fairlane's decision not to extend credit. Under ECOA, every applicant who receives an adverse action on a credit decision is entitled to a statement of the reasons for such action. 15 U.S.C. § 1691(d)(2). Since Fairlane's disclosure satisfied any duty to disclose, this count is dismissed.

Lynch qualifies as a creditor under ECOA, and must comply with some of the mandates. "Any person who regularly arranges for the extension, renewal, or continuation of credit" is charged with issuing a statement to applicants explaining why credit was denied. 15 U.S.C. § 1691a(e). The Official Staff Interpretation to ECOA indicates that "for certain purposes, the term 'creditor' includes persons such as real estate brokers who do not participate in credit decisions but who regularly refer applicants to creditors or who select or offer to select creditor to whom credit requests can be made. These persons must comply with § 202.4, the general rule prohibiting discrimination, and with § 202.5(a), on discouraging applications." 12 C.F.R. pt. 202 Supp. I, Official Staff Interpretations. Lynch Ford regularly refers applicants to creditors and selects creditors to whom credit applications can be made. Thus, Lynch is included in the definition of creditor found in ECOA. However, no provision of ECOA requires a creditor who does not participate in the credit decision to separately report to the applicant.

Further, the ECOA states that "where a creditor has been requested by a third party to make a specific extension of credit directly or indirectly to an applicant, the notification and statement of reasons required by this subsection may be made directly by such creditor, or indirectly through the third party, provided in either case that the identity of the creditor is disclosed." 15 U.S.C. § 1691(d)(4). This section foresees that multiple entities may be involved, but only requires one notification to the applicant.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*5 Thus, we hold that if only one credit agency is used, only one notification and one statement of reasons is necessary to satisfy the ECOA reporting requirement. Leguillou was informed of the credit decision by Fairlane. Thus, Lynch's duty was satisfied and Count II is dismissed because it fails to state a claim upon which relief can be granted.

III. *Count III: The Alleged Violation of the Fair Debt Collection Practices Act*

Leguillou alleges that Lynch violated the FDCPA when it repossessed his vehicle without holding a security interest. This claim is dismissed because Lynch did not rely on a security interest. Lynch Ford was the owner and had a contractual right to possess the vehicle after the contract was canceled.

The FDCPA was enacted to eliminate abusive debt collection practices by debt collectors. 15 U.S.C. § 1692(e). The FDCPA sets standards for interactions between debtors and collectors. At issue here is the FDCPA prohibition against repossessing property if "there is no present right to possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692f(6)(A).

Leguillou alleges that a debt was created by the original contract. Even if no debt was legally created, Leguillou argues that he believed Lynch's representations that a contract was fully formed. Further, Leguillou alleges that the repossession agency is governed by the FDCPA and that Lynch is liable for the actions of the repossession agency under general vicarious liability principles. Plaintiff is unable to cite any precedent applying this novel interpretation of the FDCPA.

According to the contract signed by Leguillou, Lynch could cancel the contract if financing could not be obtained. Leguillou had a contractual obligation to return the vehicle to Lynch within two days of receiving notice of the cancellation. Leguillou does not argue that the contractual provision was invalid. Thus, Lynch's right to the vehicle and its ownership of the vehicle is undisputed.

Leguillou appears to be arguing that Lynch did not have a right to repossess the vehicle because Fairlane's letter indicated that other terms might be available. This does not change the fact that, once the credit application was rejected, Lynch had a contractually derived right to cancel the contract. Leguillou no longer had any legal interest in the vehicle. Lynch was not exercising a creditor's right to repossess a vehicle which secured a debt; Lynch was only repossessing its own vehicle. The FDCPA was meant to protect the rights of debtors. However, since Leguillou never actually owned the car, he never became a "debtor" for FDCPA purposes.

In *Williams*, Judge Holderman considered a similar claim and found that the dealership was not responsible for the "allegedly illegal acts of its debt-collector agent who reposed her automobile. *Williams*, 1999 WL at *4. Leguillou distinguishes Judge Holderman's analysis by citing two cases which he claims support vicarious liability in this situation. The first case, *Simpson v. Merchants Recovery Bureau, Inc.* held that a *sua sponte* summary judgment was improper because the plaintiff did not have notice or an opportunity to respond. *Simpson*, 171 F.2d 546 (7th Cir.1999). Plaintiff argues that this holding means that we should not dismiss his vicarious liability claims without allowing him an opportunity to present evidence supporting the theory. We are not dismissing Leguillou's claim on vicarious liability grounds, however, we are dismissing it because this situation is not governed by the FDCPA.

*6 The second case cited by Leguillou is *Randle v. G.C. Services, L.P.*, 25 F.Supp.2d 849 (N.D.Ill.1998). In *Randle*, Judge Gettleman held that agency principles apply to hold a limited partner of a debt collection agency liable. Neither case cited, nor any precedent this Court was able to find applies the FDCPA in a situation similar to the instant case.

Lynch Ford owned the automobile. Since they were not recovering property serving as a security interest, the FDCPA provides plaintiff no relief. No set of facts could exist which would state a FDCPA claim. Thus, Count III is dismissed.

## CONCLUSION

The 12(b)(6) Motion to Dismiss brought by Lynch Ford is granted as to Counts I, II, and III because those Counts fail to state a claim upon which relief can be granted. Because we decline to exercise jurisdiction over the state law claims contained in Counts IV, V and VI, we dismiss those Counts. This case is terminated.

It is so ordered.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Curtis JASPER, Plaintiff,
v.
NEW ROGERS PONTIAC, INC., Defendant.

No. 99 C 5195.

Nov. 5, 1999.

*MEMORANDUM OPINION*

KOCORAS, J.

*1 This matter comes before the Court on Defendant's motion to dismiss Count I of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted.

BACKGROUND

For purposes of this motion, the following facts, which come from Plaintiff's Amended Complaint are taken as true. On November 28, 1998, Plaintiff Curtis Jasper ("Jasper") purchased a 1996 Buick Riviera from Defendant New Rogers Pontiac. Jasper tendered a down payment of $2,000 and traded in his 1993 Pontiac Grand Am, for which he was credited $9,500. Jasper also signed a retail installment contract (the "Contract"), which included Truth in Lending disclosures and provided for an annual percentage rate of 22.95%. The Contract had a rider, which, in relevant part, made the Contract null and void if New Rogers Pontiac was unable to assign the Contract to a sales financing agency and if New Rogers Pontiac so informed the buyer, Jasper, of its inability.

A few weeks later, a salesperson from New Rogers Pontiac informed Jasper that it was unable to assign Jasper's Contract. The salesperson then asked Jasper to return the car and suggested that New Rogers Pontiac could sell Jasper a cheaper car. On December 27, 1998, New Rogers Pontiac repossessed the vehicle. Jasper was unaware that the car had been repossessed and so, filed a police report for auto theft. After discovering the car had been repossessed, Jasper went to New Rogers Pontiac and demanded that his down payment and trade-in vehicle be returned. New Rogers Pontiac complied, but deducted $300 for the costs of repossession.

Count I of Plaintiff Jasper's Amended Complaint alleges a violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"). Also, Jasper, in two other counts, brings two claims based on state law. In this action, Defendant New Rogers Pontiac moves to dismiss Count I for failing to state a claim under TILA. Moreover, because the Court's jurisdiction over this action is predicated on federal subject matter jurisdiction over the TILA claim, Defendant moves the Court to dismiss the entire claim in conjunction with the dismissal of the TILA claim for lack of subject matter jurisdiction.

LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. A defendant must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992), *cert. denied,* 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992). With these principles in mind, the Court evaluates Defendant's motion.

DISCUSSION

*2 Plaintiff Jasper asserts in Count I of his Amended Complaint that Defendant New Rogers Pontiac violated TILA and Regulation Z. According to Jasper, the disclosures made under the Contract should have been labeled as "estimates" because they were not actual terms of the contract, but rather terms Jasper could have received under the Contract,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT 5

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Curtis JASPER, Plaintiff,
v.
NEW ROGERS PONTIAC, INC., Defendant.

No. 99 C 5195.

Nov. 5, 1999.

*MEMORANDUM OPINION*

KOCORAS, J.

*1 This matter comes before the Court on Defendant's motion to dismiss Count I of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted.

BACKGROUND

For purposes of this motion, the following facts, which come from Plaintiff's Amended Complaint are taken as true. On November 28, 1998, Plaintiff Curtis Jasper ("Jasper") purchased a 1996 Buick Riviera from Defendant New Rogers Pontiac. Jasper tendered a down payment of $2,000 and traded in his 1993 Pontiac Grand Am, for which he was credited $9,500. Jasper also signed a retail installment contract (the "Contract"), which included Truth in Lending disclosures and provided for an annual percentage rate of 22.95%. The Contract had a rider, which, in relevant part, made the Contract null and void if New Rogers Pontiac was unable to assign the Contract to a sales financing agency and if New Rogers Pontiac so informed the buyer, Jasper, of its inability.

A few weeks later, a salesperson from New Rogers Pontiac informed Jasper that it was unable to assign Jasper's Contract. The salesperson then asked Jasper to return the car and suggested that New Rogers Pontiac could sell Jasper a cheaper car. On December 27, 1998, New Rogers Pontiac repossessed the vehicle. Jasper was unaware that the car had been repossessed and so, filed a police report for auto theft. After discovering the car had been repossessed, Jasper went to New Rogers Pontiac and demanded that his down payment and trade-in vehicle be returned. New Rogers Pontiac complied, but deducted $300 for the costs of repossession.

Count I of Plaintiff Jasper's Amended Complaint alleges a violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"). Also, Jasper, in two other counts, brings two claims based on state law. In this action, Defendant New Rogers Pontiac moves to dismiss Count I for failing to state a claim under TILA. Moreover, because the Court's jurisdiction over this action is predicated on federal subject matter jurisdiction over the TILA claim, Defendant moves the Court to dismiss the entire claim in conjunction with the dismissal of the TILA claim for lack of subject matter jurisdiction.

LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. A defendant must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992), *cert. denied,* 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992). With these principles in mind, the Court evaluates Defendant's motion.

DISCUSSION

*2 Plaintiff Jasper asserts in Count I of his Amended Complaint that Defendant New Rogers Pontiac violated TILA and Regulation Z. According to Jasper, the disclosures made under the Contract should have been labeled as "estimates" because they were not actual terms of the contract, but rather terms Jasper could have received under the Contract,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

subject to financing approval of a third-party. New Rogers Pontiac claims that TILA does not require it to label disclosures as estimates simply because a condition subsequent could void the Contract altogether and all the terms and disclosures thereunder. Thus, New Rogers Pontiac argues that Jasper's claim does not allege a violation under TILA.

Jasper misunderstands TILA and Regulation Z, by which TILA is implemented. TILA requires certain disclosures prior to the consummation of a credit transaction. *See* 15 U.S.C. §§ 1601, 1638; 12 C.F.R. § 226.17(b); *Janikowski v. Lynch Ford, Inc.*, No. 98 C 8111, 1999 WL 608714 (N.D.Ill. Aug. 5, 1999). Plaintiff Jasper does not contend that New Rogers Pontiac did not make the appropriate disclosures under TILA. Rather, Jasper claims that the disclosures were estimates and should have so been labeled. Regulation Z provides:

> (c) Basis of disclosures and use of estimates.
> (1) The disclosures shall reflect the terms of the legal obligation between the parties.
> (2)(i) If any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided to the consumer, and shall state clearly that the disclosure is an estimate. 12 C.F.R. § 226.17(c).

Jasper seems to reason that New Rogers Pontiac could not make any accurate disclosures without knowing whether it could ultimately assign the Contract. Thus, according to Jasper, Regulation Z required New Rogers Pontiac to label the disclosures as estimates.

However, New Rogers Pontiac's ability to void the Contract between Jasper and New Rogers Pontiac does not affect the substance of the disclosures but affects the timing of the Contract's consummation. *See Graves v. Tru-link Fence Co.*, 905 F.Supp. 515, 519-20 (N.D.Ill.1995). "Consummation" of a contract occurs when a consumer becomes contractually obligated on a credit transaction. *See* 12 C.F.R. § 226.2(13). If the ability to assign the Contract was a condition precedent, then the Contract was never consummated and a binding obligation never formed. *See id.* at 519. However, if it was a condition subsequent, a binding obligation was created, which could then be discharged upon the failure to assign the Contract. *See id.* at 520.

Thus, New Rogers Pontiac's ability to void the Contract is significant to Jasper as a condition subsequent. With it, Jasper can support his allegation that he consummated the Contract on November 28, 1998 when he signed the Contract, paid the down payment, and traded in his old car, rather than when and if New Rogers Pontiac assigned his Contract. So, New Rogers Pontiac had an obligation to make its disclosures before Jasper signed the Contract on November 28, 1998. 12 C.F.R. § 226.17(b). New Rogers Pontiac did so.

*3 The fact that the entire Contract was later voided upon the occurrence of the condition subsequent does not affect the accuracy of the disclosures made on November 28, 1998. Jasper only takes issue with the voidability of the Contract and nowhere alleges that the disclosures were otherwise inaccurate. However, the voidability of the Contract alone does not make the disclosures inaccurate so as to necessitate their being labeled as estimates. Thus, Jasper has cited no violation of TILA by New Rogers Pontiac and has failed to state a claim in Count I of his Amended Complaint. The Court dismisses Plaintiff Jasper's Count I. The Court also dismisses Plaintiff Jasper's Amended Complaint in its entirety because without the TILA claim the Court lacks jurisdiction over the remaining state law claims.

CONCLUSION

For the reasons set forth above, we grant Defendant New Rogers Pontiac's motion to dismiss Count I and the Amended Complaint in its entirety.

1999 WL 1024522, 1999 WL 1024522 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

UNITED STATES DISTRICT COURT
STATE OF MINNESOTA
FOURTH DIVISION

---

Cheritylee Ann Stevens and David Mathew Stevens,

Plaintiffs,

vs.

Brookdale Dodge, Inc.,

Defendant.

Court File No.: CV-00-2632 MJD/SRN

---

COPY

DEPOSITION OF CHERITYLEE ANN STEVENS

MARCH 19, 2002

12:20 PM

MELISSA A. FLOOD
CHASER COURT REPORTING
16810 WESTBURY AVENUE SOUTHWEST
PRIOR LAKE, MINNESOTA 55372



EXHIBIT K

Q Now your husband testified that you had contacted Norwest Bank sometime prior to going to the Toyota dealership up in Coon Rapids to talk about financing?
A I don't believe that it was before we went to Toyota. I'm not sure that it was before. I think it was between the time we went to Brookdale and the time we went to Toyota.
Q You went to Brookdale Dodge, we know, and signed this paperwork on January 11th of 2000. Do you recall when it would have been that you went to the Toyota dealership?
A It was within a week.
Q Okay.
A I would say it was within a week for sure.
Q Was that, in fact, the Carlson Toyota up there?
A I'm not positive of the name.
Q So sometime during that week, intervening week period, you contacted Norwest Bank?
A Correct.
Q And that's your personal bank?
A Yes.
Q And you talked to them about financing a car?

14 or $15,000 on a car; correct?
A Yes.
Q Now how many times did you visit the Toyota dealership, do you recall?
A The Toyota dealership, once.
Q What do you recall happening up there?
A It was late in the evening. We went to the dealership. We kind of walked around in the parking lot. Somebody came out and asked us what we were looking for. We went into the office. We drove an Intrepid around, took it for a test-drive.
Then we went into the office. We filled out some paperwork, which was just the credit application. Then they said they would get back to us, and that was the end of -- they knew that they wouldn't be able to get back to us for a couple of days just because I think it was on the weekend or something.
Q Okay. And your husband was with you?
A Yes.
Q And the one document you do recall signing was the credit application?
A Yes.

Q Anything other than that?
A Not that I recall.
Q You didn't put any money down?
A Absolutely not.
Q Now they were supposed to get back to you. Did they, in fact, get back to you?
A Not that I'm aware of.
Q Did you try to call them?
A No.
Q Is there any reason why you didn't?
A Not any specific reason.
Q Did you receive anything in the mail from them as to your visit to the dealership, the credit application or anything?
A I'm not positive, but I think that we did get a paper just saying that we did qualify for financing from them. But at that point, by the time we got that, we had already been to Brookdale.
Q And you think that document came from the Toyota dealership or did it come from a lending institution?
A Toyota.
Q Okay.
A I remember seeing the Toyota logo in the

Subway?
A Yes, which was a long time after that.
Q And then NHCD?
A Correct.
Q Did you return to Select Comfort after your maternity?
A No, I did not.
Q When did you start that Subway job, roughly?
A Honestly, I have no idea. I have no idea. I believe it was in the summer. That's the best I can give you.
Q The summer of 2000?
A Yes.
Q Why did you decide to sign the paperwork on the 1999 Dodge Stratus and purchase the vehicle?
A Could you be more specific, please?
Q Why did you decide to go ahead with the transaction and purchase the vehicle?
A I don't know. I don't understand what you want to know. Why we purchased the car?
Q Why did you go ahead and sign the purchase agreement and the retail installment contract?
A Because we needed a car.

Q I take it you understood you could purchase a car from any dealership that you wanted to; correct?
A Initially.
Q What led you to go to Brookdale Dodge?
A The signs on their window, "5-Star dealership, no downpayment, low monthly payments."
Q Anything else?
A No, that was the reason I stopped.
Q And you were also interested in a Dodge, it sounds like?
A Yes.
Q Had you looked in the paper at all for people selling Dodges?
A No.
Q And how many times were you at Brookdale Dodge?
A Three, maybe four.
Q How many times was your husband with you?
A Once.
Q I take it the only time he was with you was on January 11th of 2000?
A Correct.
Q How many times were you at Brookdale Dodge

before you signed the purchase agreement and retail installment contract?

A It would have been a total of three or four. So before that, it would have been two or three.

Q And these all occurred, obviously, within the one-week period after you left Carlson Toyota?

A It was within a total of two weeks. It was about ten days, so maybe it was longer than a week from the time we left Toyota and went to Brookdale.

Q Okay.

A It might have been a total of two weeks because I know that it was about ten days total from the first day I went in until the 11th.

Q Why did it take so long?

A You'll have to ask the dealership. We were waiting on them.

Q So the first time you went there, who did you speak with?

A I believe his name was Mike or Bill. Those were the two salespeople that I spoke with. One of them was there the first time, and

meeting?
A I'm not sure, but I can assume it was during the day because my husband was at work.
MR. BARRY: Don't guess.
BY MR. JOHNSON:
Q It was also a weekday then, I assume; correct?
A Yes.
Q Did you call your husband from the dealership that day to talk about the Intrepid?
A I don't recall.
Q But you left with the understanding that they were going to try to look for financing for you?
A Correct.
Q And had you submitted or filled out a credit application then?
A Yes.
Q Did you talk about which lenders they would be looking for?
A No, they told me they would just try to find one.
Q Did you tell them that Norwest Bank had indicated you could get a 9 to 10 percent

during that period of time?
A I don't remember.
Q You recall one conversation where they still hadn't been able to see if financing was approved?
A Right.
Q Can I assume that at some point they called you and said, "Come on in. We have financing"?
A Yes.
Q When would that have taken place?
A The 9th or 10th of January, 2000.
Q Do you recall who you spoke to on that occasion?
A Bill or Mike.
Q What do you recall Bill or Mike saying?
A Just that, "We've got the financing gone through. We're going to be able to get you $360 a month. That's the lowest we could get it, so all we need you to do is come in and fill out the paperwork, sign the papers and it's all yours."
Q Now in that conversation, did you ask the person you were speaking with what the interest rate would be?

UNITED STATES DISTRICT COURT
STATE OF MINNESOTA
FOURTH DIVISION

---

Cheritylee Ann Stevens and David Mathew Stevens,

Plaintiffs,

vs.

Brookdale Dodge, Inc.,

Defendant.

Court File No.: CV-00-2632 MJD/SRN

---

COPY

DEPOSITION OF DAVID MATHEW STEVENS

MARCH 19, 2002

10:00 AM

MELISSA A. FLOOD
CHASER COURT REPORTING
16810 WESTBURY AVENUE SOUTHWEST
PRIOR LAKE, MINNESOTA 55372



EXHIBIT

A Right.
Q If you need to take a break, let me know.
A Okay.
Q You understand that we're here today to talk about a 1999 Dodge Stratus that you purchased at Brookdale Dodge on January 11th of 2000; is that correct?
A Yes.
Q Do you still own that car?
A Yes.
Q That was financed through Community Credit?
A Correct.
Q And are you still with Community Credit on that?
A Actually, Wells Fargo bought them out.
Q And when did that take place as far as you know?
A I couldn't tell you. It was sometime last year.
Q Do you have the same payment terms as you had --
A Right.
Q -- with Community Credit?
A Right.
Q The other thing we need to try and keep in

exactly.

Q Who was the bank on that transaction?

A Arcadia Financial.

Q Where did you buy that car?

A I don't remember the name of the dealership.

Q Was it a new dealership or a used?

A It was used.

Q Let's go back to since you've been married to your wife. What was the date you were married, by the way?

A March 29th.

Q So it's coming up?

A Yep.

Q Of '99 then?

A Yes.

Q Since that time, what vehicles have you owned?

A The Daytona and the Stratus. I owned the Daytona. Cherity owned a Honda CRX, and she traded the CRX in for the Stratus. And since then, we've been given a car from my in-laws, her mother. Actually, it's her stepfather now. That's a Chevy Camaro.

Q Why was the Daytona repossessed?

A Not making payments.

Q Why was it in January of 2000 that you and your wife were looking for a different car?
A Because my wife was -- it was after our son was born. It was impractical to use a CRX because we couldn't fit a baby seat in it. The Daytona was breaking down constantly, so we needed a vehicle to be able to move a family around.
MS. STEVENS: Can I excuse myself to the rest room?
MR. JOHNSON: Yes.
BY MR. JOHNSON:
Q Have you ever been a defendant in a lawsuit?
A No, not that I can recall.
Q Did Arcadia sue you for any amount after they repossessed the vehicle?
A Not yet, no. I'm making payments now.
Q Are you represented by any attorney in that?
A No.
Q Now the company that you worked for, the credit counseling company --
A Yes.
Q -- is that a company that assists people in reorganizing their debts and things like that?

question?

MR. JOHNSON: Yes.

BY MR. JOHNSON:

Q Why is it that you decided to sign the retail installment contract?

A Because we needed a vehicle.

Q I take it that there was nothing preventing you from looking at other dealerships for cars on January 11th of 2000?

A Other than the fact that I was working 11 hours a day, no.

Q There's a variety of dealerships that sell Dodge products; correct?

A I imagine in the State of Minnesota, yes.

Q There's nothing that compelled you to go to Brookdale Dodge or to sign Exhibit Number 4; correct?

A Compelled me, no.

Q You also understood that if you didn't like the purchase terms or the credit terms or anything to do with the transaction, you could leave; correct?

A No, I didn't understand that.

Q Why did you not understand that?

A I wasn't explained that. I had never

purchased a vehicle from a dealership of that size and for that price.
Q What would compel you to have to purchase a vehicle at Brookdale Dodge?
A Nothing compelled me to other than the fact that we needed a vehicle to be able to carry our family.
Q That's why I didn't understand your response. You understood, obviously, that you didn't have to buy a car at Brookdale Dodge; correct?
A Correct.
Q You understood that you didn't have to agree to purchase a car at Brookdale Dodge for $14,490; correct?
A Correct.
Q And you didn't have to agree to any of the terms of the transaction; correct?
A I didn't understand that, no.
Q You knew you could walk out; correct?
A Like I had said before, I had never purchased a vehicle of that size. I wasn't familiar with how you handle anything as far as the transaction goes.
Q What would lead you to conclude that after

## CONDITIONAL DELIVERY AGREEMENT AND GRANT OF SECURITY INTEREST IN A MOTOR VEHICLE

YOU, the undersigned Buyer and Co-Buyer, agree with ME, the Dealer, to incorporate the following terms by reference into the Motor Vehicle Purchase Contract to purchase the vehicle described as follows:

THIS AGREEMENT MAY AFFECT YOUR INSTALLMENT SALES CONTRACT BUT IS NOT PART OF IT.

| Year | Make | Model | VIN |
|---|---|---|---|
| 1993 | DODG | STRS | 1B3LJ46X9XN592477 |

1. YOU hereby grant and convey to ME a security interest in the motor vehicle described above to secure the full and faithful performance of all obligations of this Agreement and the Motor Vehicle Purchase Contract.
2. YOU understand and agree that the vehicle has been delivered to YOU conditionally subject to approval of financing and/or payment of a check, draft or other instrument. If financing is not approved on the terms set out in your Installment Sales Contract, I will notify YOU and YOU agree to immediately return the vehicle to ME. In addition, YOU agree to pay twenty-five cents per mile for all miles placed on the vehicle after delivery plus any or all damages beyond normal wear and tear. If financing is not approved, any Installment Sales Contract executed for purpose of the above-described vehicle shall be null and void.
3. YOU agree and warrant that any check, draft or other instrument tendered in payment under the Motor Vehicle Purchase Contract will be paid according to its terms and not dishonored for any reason.
4. In the event that YOU default upon this Agreement or the Motor Vehicle Purchase Contract, I may immediately repossess the vehicle without notice to YOU and sell it as provided by law. I may also exercise other remedies provided by law or by contract.
5. Upon YOUR performance under this Agreement and the Motor Vehicle Purchase Contract and upon assignment of any Installment Sales Contract to a lending institution, the terms of this Agreement set out above shall automatically lapse.

YOU have read and understand this document, intend it to be a binding part of YOUR contract to purchase a motor vehicle and acknowledge receiving a copy of it.

Buyer's Signature ______ Date: 11 JAN 2000 ______ Authorized Signature for Dealer ______

Co-Buyer's Signature ______ Date: 11 JAN 2000 ______ Title: BUSINESS MANAGER

750/790

## CHECK PLEDGE AND NOTE

As part of the purchase agreement, YOU, the undersigned Buyer and Co-Buyer are delivering a check to ME, the Dealer, in the amount of $ 1500.00 covering all or part of the payment. If for any reason I am unable to negotiate the check, YOU promise to pay the full amount immediately at MY offices. If YOU do not make immediate payment in full, any outstanding amount shall bear interest at the rate of 8% Annual Percentage Rate from the date signed below. Presentment for payment, notice of dishonor and protest are hereby waived. No extension of payment shall release the Buyer or Co-Buyer signing below. All expenses of collection, with or without suit, including reasonable attorney's fees shall also be due.

Buyer's Signature ______ Date: 11 JAN 2000 ______ Co-Buyer's Signature ______

## POWER OF ATTORNEY - (General Form)

The undersigned Buyer and Co-Buyer make, constitute and appoint BROOKDALE DODGE as their true and lawful Attorney in Fact authorized in their name, place and stead, to:

PERFECT TITLE WORK

The Attorney in Fact is granted full power and authority to perform any and all acts necessary or incident to the power granted herein, as fully as the Grantor's might if personally present, with full power of substitution.

Buyer's Signature ______

Co-Buyer's Signature ______

## CREDIT REPORTING DISCLOSURE

In compliance with the Federal Fair Credit Reporting Act, WE are providing YOU the following information and request that YOU acknowledge by signing below YOUR Credit Application to finance YOUR vehicle purchase is being submitted for consideration to one or more of the following financial institutions:

| NAME OF FINANCIAL INSTITUTION: | ADDRESS: |
|---|---|
| BANK ONE | 111 E WISCONSIN AVE MILWAUKEE, WI 53201 |
| CHRYSLER FINANCIAL CORPORATION | 1650 W 82ND ST.#1150 BLOOMINGTON MN. 55431 |
| → COMMUNITY CREDIT COMPANY | 5717 XERXES AVE NO. BROOKLYN CENTER, MN. 55430 |
| GE CAPITAL AUTO LEASE INC | PO BOX 310 BARRINGTON, IL 60010 |
| GOLD KEY LEASE, INC. | 1650 W 82ND ST. #1150 BLOOMINGTON, MN. 55431 |
| MARQUETTE BANK | 7575 BROOKLYN BLVD BROOKLYN PARK, MN 55443 |
| US BANK | PO BOX 2687 FARGO, ND 58108 |
| OLYMPIC FINANCIAL LTD. | 7825 WASHINGTON AVE. MINNEAPOLIS, MN. 55439-2444 |
| PRIMUS AUTO FIN SERV INC | 5500 WAYZATA 1010 MPLS 55416 |

Buyer's Signature ______ Date: 11 JAN 2000 ______ Co-Buyer's Signature ______

## PAYOFF AGREEMENT

The payoff amount of $ 3770.57 on YOUR 1991 (Year) HOND (Make) CIVI (Model) JHMED936XMS012146 (VIN) traded to US is an estimated payoff. If the payoff figure is underestimated, YOU agree to pay the increased payoff difference in cash. If overestimated, I agree to credit the difference to YOU.

Buyer's Signature ______ Date: 11 JAN 2000 ______ Authorized Signature for Dealer ______

Co-Buyer's Signature ______ Date: 11 JAN 2000 ______ Title ______

## REQUEST TO SECURITY HOLDER TO RELEASE SECURITY INTEREST AND FORWARD CERTIFICATE OF TITLE OR SECURITY RELEASE

TO: NORWEST BANK MN NA (Secured Party) ______ Address ______

City, State, Zip ______

You are hereby authorized and directed upon receipt of this order and attached check in the amount of $ 3770.57 to cancel the Security Interest against this motor vehicle:

| Year | Make | Model | VIN |
|---|---|---|---|
| 1991 | HOND | CIVI | JHMED936XMS012146 |

Said security interest having been noted on Certificate of Title No. ______. Please record the Cancellation of the Security Interest on the Certificate of Title or Lien Release Card as appropriate and forward the document to us as dealer purchaser of the vehicle.

Dealer Purchaser's Name: BROOKDALE DODGE INC. Address: 6800 BROOKLYN BLVD

City, State, Zip: BROOKLYN CENTER, MN 55429 Authorized Signature for Dealer ______ Date: 11 JAN 2000

The undersigned title owner(s) agree to the foregoing and warrants that the vehicle has no undisclosed owners or liens.

Owner's Signature ______ Date: 11 JAN 2000 ______ Co-Owner's Signature ______

© 1996 MADA Services, Inc. MADA-70660

BD000101

EXHIBIT

*JOHNSON & VAN VLIET*

*A Limited Liability Partnership*

*GREGORY J. JOHNSON*
*KAREN MELLING VAN VLIET*

*ATTORNEYS AT LAW*
*332 Minnesota Street*
*Suite West 975*
*St. Paul, Minnesota 55101*
*Telephone: (651) 227-2534*
*Fax: (651) 297-6226*
*website: http://johnsonvanvliet.lawoffice.com*

*KLAY C. AHRENS*
*DANIEL J. RYAN*
*JEANNIE PROVO-PETERSEN*

January 2, 2003

Thomas Lyons, Sr.
Thomas J. Lyons & Associates, P.A.
Consumer Justice Center, P.A.
342 East County Road D
Little Canada, MN 55117

Re: Case Name: Cherity & David Stevens v. Brookdale Dodge, Inc.
Court File: CV-00-2632 MJD/SRN
Our File No.: 10922

Dear Counsel:

Enclosed please find a Stipulation of Dismissal with prejudice relative to the "estimate" claim that was alleged in the Amended Complaint.

As you know, Plaintiffs' claim that the dealership violated the TILA by not labeling the TIL disclosures as estimates has been rejected by numerous courts, including the Minnesota federal district court. See, e.g., Vang v. Morrie's Minnetonka Ford, 2001 WL 1589614 (D. Minn. Dec. 11, 2001) (Frank, Judge) (rejecting argument that dealership violates TILA by not labeling TIL disclosures as "estimates" when the retail installment contract is contingent upon financing approval by a lender); Janikowski v. Lynch Ford, Inc., 210 F.3d 765, 767 (7th Cir. 2000) (dismissing claim that dealership violated TILA by not labeling disclosures as estimates because "[i]f the financing condition had been satisfied, Janikowski would be able and obligated to purchase the car at 5.9%"); Tripp v. Charlie Falk Auto, 2001 WL 1105132 at *5 (E.D. Va. 2001) (the condition of financing approval by a third-party lending institution does not necessitate labeling the disclosed terms estimates); Burns v. Elmhurst Auto Mall, Inc., 2001 WL 521840 (N.D. Ill. May 16, 2001) (same); Leguillous v. Lynch Ford, Inc., 2000 WL 198796 (N.D. Ill. Feb. 14, 2000) (same); Jasper v. New Rogers Pontiac, Inc., 1999 WL 1024522 at *2-3 (N.D. Ill. Nov. 5, 1999) (dismissing claim and noting that dealership's inability to arrange financing on terms specified in installment contract "does not make the disclosures inaccurate so as to necessitate their being labeled as estimates").

Additionally, the alleged violation is not one which could even give rise to an award of statutory damages under the TILA.

EXHIBIT N

In light of the foregoing, kindly execute the enclosed stipulation and return the same to me for filing with the Court.

Very truly yours,

Gregory J. Johnson

GJJ/tbm

enclosure

cc: Mr. Blake W. Duerre (w/enclosure)

**UNITED STATES DISTRICT COURT**
**STATE OF MINNESOTA**
**FOURTH DIVISION**

Court File No.: CV- 00-2632 JEL/JGL

Cheritylee Ann Stevens and David Mathew Stevens,

Plaintiffs,

vs.

**STIPULATION OF DISMISSAL WITH PREJUDICE OF RELATING TO PLAINTIFFS' "ESTIMATE" CLAIM UNDER TILA AND ORDER FOR JUDGMENT**

Brookdale Dodge, Inc.

Defendant.

Whereas, Plaintiff desires to dismiss the "estimate" claim that is alleged in Paragraph 16 of Count I of the Amended Complaint in this case, **IT IS HEREBY STIPULATED AND AGREED** by and between the parties, through their respective undersigned counsel, that Plaintiffs' estimate claim in the above-captioned matter may be and hereby is dismissed with prejudice and without costs, disbursements or attorney's fees and that any party hereto may apply to the Court pursuant to this Stipulation for an Order directing that judgment of dismissal with prejudice be entered accordingly.

Dated: ___________________

**THOMAS LYONS & ASSOCIATES, P.A.**

________________________________
Thomas J. Lyons, Esq.
Attorney for Plaintiffs
342 East County Road D
Little Canada, MN 55117
(651) 770-9797

Dated: ________________

**JOHNSON & VAN VLIET, L.L.P.**

______________________________

Gregory J. Johnson (#202678)
Attorney for Defendant
332 Minnesota Street
First National Bank Building
Suite West 975
St. Paul, Minnesota 55101
(651) 227-2534

**ORDER FOR JUDGMENT**

Upon the foregoing Stipulation, IT IS HEREBY ORDERED that the Clerk of this Court shall forthwith enter judgment dismissing Plaintiffs' Count I estimate claim with prejudice and without costs, disbursements or attorney's fees.

**BY THE COURT:**

Dated: ________________

______________________________

Judge of District Court